Daniel Sadeh, Esq.
**HALPER SADEH LLP**
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLEN CHAIDEZ,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMUNICATIONS SYSTEMS, INC., ROGER H.D. LACEY, ANITA KUMAR, STEVEN C. WEBSTER, RANDALL D. SAMPSON, RICHARD A. PRIMUTH, and MICHAEL ZAPATA,<br><br>    Defendants. | Case No:<br><br>JURY TRIAL DEMANDED |

### COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Allen Chaidez ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

### NATURE OF THE ACTION

1.   This is an action against Communications Systems, Inc. ("Communications Systems" or the "Company") and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a), and Rule 14a-9 promulgated

1

thereunder by the SEC, 17 C.F.R. § 240.14a-9, in connection with the sale of the Company's "Transition Networks" and "Net2Edge Limited" businesses (i.e., its Electronics & Software ("E&S") segment) to Lantronix, Inc ("Lantronix") (the sale referred to as the "Proposed Transaction").

2. More specifically, on April 28, 2021, the Company entered into a securities purchase agreement with Lantronix pursuant to which the Company shall receive approximately $25 million in cash plus earnout payments of up to $7 million based upon achieving certain revenue milestones in connection with the Proposed Transaction.

3. On June 15, 2021, Defendants caused to be filed with the SEC a Schedule 14A Definitive Proxy Statement (the "Proxy Statement") in connection with the Proposed Transaction.

4. The Proxy Statement, which recommends that the Company's stockholders vote in favor of, among other things, the Proposed Transaction, omits and/or misrepresents material information concerning: (1) the financial analyses performed by Communications Systems's financial advisor, Northland Securities, Inc. ("Northland"), in connection with its fairness opinion; and (2) the sales process leading up to the Proposed Transaction.

5. These material misrepresentations and omissions prevent the Company's shareholders from making a fully informed voting decision relating to the Proposed Transaction. Accordingly, the Company's shareholders will be irreparably harmed if these material misrepresentations and omissions are not remedied before the anticipated shareholder vote on the Proposed Transaction, currently scheduled for July 28, 2021.

## JURISDICTION AND VENUE

6. The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the

SEC (17 C.F.R. § 240.14a-9).

7. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District and the alleged misstatements entered and the subsequent damages occurred in this District.

9. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

10. Plaintiff is, and has been at all relevant times hereto, an owner of Communications Systems common stock.

11. Defendant Communications Systems, through its subsidiaries, provides connectivity infrastructure products and services for deployments of broadband networks worldwide. The Company is incorporated in Minnesota. The Company's common stock trades on the NASDAQ under the ticker symbol, "JCS."

12. Defendant Roger H.D. Lacey ("Lacey") is Executive Chairman of the Board of the Company.

13. Defendant Anita Kumar ("Kumar") is Chief Executive Officer ("CEO") and a director of the Company.

14. Defendant Steven C. Webster ("Webster") is a director of the Company.

15. Defendant Randall D. Sampson ("Sampson") is a director of the Company.

16. Defendant Richard A. Primuth ("Primuth") is a director of the Company.

17. Defendant Michael Zapata ("Zapata") is a director of the Company.

18. Defendants Lacey, Kumar, Webster, Sampson, Primuth, and Zapata are collectively referred to herein as the "Individual Defendants."

19. Defendants Communications Systems and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**A. Background of the Company and the Proposed Transaction**

20. Communications Systems classifies its businesses into two segments, E&S and Services & Support ("S&S").

21. According to the Company, its E&S segment designs, develops, and sells Intelligent Edge solutions that provide connectivity and power through Power over Ethernet products and actionable intelligence to end devices in an Internet of Things ecosystem through embedded and cloud-based management software. This segment also offers products such as media converters, network interface cards, and Ethernet switches. The E&S segment's products are used in various markets, including federal government, enterprise, service provider, industrial, security, and surveillance markets.

22. According to the Company, its S&S segment provides software-designed wide-area network and other technology solutions that address IT challenges, including network resiliency, security products and services, network virtualization, and cloud migrations, IT managed services, wired and wireless network design and implementation, and converged infrastructure configuration, deployment and management. This segment primarily serves vertical markets such

4

as healthcare, education, and commercial business.

23. On March 2, 2021, the Company announced it had entered into a definitive merger agreement with privately held Pineapple Energy LLC ("Pineapple"), an operator and consolidator of residential solar, battery storage, and grid services solutions. A meeting of the Company's shareholders is expected to be held later in 2021 to vote on whether to approve that transaction.

24. When the merger with Pineapple was announced, the Company stated its intention "to divest substantially all its current operating and non-operating assets, including its [E&S] business, its [S&S] business, real estate holdings, and cash, cash equivalents, and investments." According to the Company, the sale of its E&S segment is part of its "strategy to monetize [its] assets for the benefit of the [Communications Systems] shareholders existing prior to the effective date of the proposed merger with Pineapple."

25. On April 29, 2021, the Company announced that it had signed a definitive securities purchase agreement with Lantronix to sell its Transition Networks and Net2Edge businesses for a "base price of $25.0 million to be paid at closing, subject to a working capital adjustment following the closing, plus up to an additional $7.0 million in earnout payments based on revenue milestones for the Transition Networks and Net2Edge businesses in the two 180-day periods after closing of the sale." The Proposed Transaction requires the approval of the holders of at least two-thirds of the Company's common stock outstanding and entitled to vote. *See* Proxy Statement 4. The press release announcing the Proposed Transaction states, in pertinent part:

**Communications Systems to Sell its Transition Networks and Net2Edge Businesses for $25.0 Million Paid at Closing Plus up to an Additional $7.0 Million in Earnout Payments**

*Following closing, CSI intends to distribute $3.50 cash per share or approximately $35 million to its shareholders from the net sale proceeds and other available cash*

5

April 29, 2021 08:00 AM Eastern Daylight Time

MINNETONKA, Minn.--(BUSINESS WIRE)--Communications Systems, Inc. (NASDAQ: JCS) ("CSI" or the "Company"), an IoT intelligent edge products and services company, today announced that it entered into a definitive securities purchase agreement ("Purchase Agreement") with Lantronix, Inc. (Nasdaq: LTRX) ("Lantronix"), to sell the Company's Transition Networks and Net2Edge businesses to Lantronix for a base price of $25.0 million to be paid at closing, subject to a working capital adjustment following the closing, plus up to an additional $7.0 million in earnout payments based on revenue milestones for the Transition Networks and Net2Edge businesses in the two 180-day periods after closing of the sale.

The sale of these businesses requires CSI shareholder approval and is also subject to customary closing conditions. Assuming CSI's shareholders approve the transaction, it is expected to close in June 2021. The Transition Networks and Net2Edge businesses represent substantially all of the assets of the Company's Electronics & Software segment, which had 2020 revenues of $34.5 million.

Concurrently with the closing of the Purchase Agreement, CSI and Lantronix will enter into a Transition Services Agreement under which CSI will perform administrative and IT services and license office, warehouse and production space at its Minnetonka, MN facility for the transferred businesses for up to twelve months.

Lantronix is a global provider of Software as a Service (SaaS), connectivity services, engineering services, intelligent hardware solutions for the Internet of Things (IoT) and Remote Environment Management (REM).

Roger Lacey, Executive Chairman of CSI, commented, "This transaction is integrally related to our previously announced merger with Pineapple Energy, LLC ("Pineapple"), a growing U.S. operator and consolidator of residential solar, battery storage, and grid services solutions. When we announced the merger with Pineapple, we also announced we planned to substantially divest all of our existing businesses, real estate holdings, and cash, cash equivalents, and investments and distribute available sale proceeds from any pre-merger divestitures, together with other available cash in the form of a cash dividend to existing CSI shareholders prior to the effective date of the Pineapple merger.

"While we do not yet know the exact amount and timing of the cash dividends, related to this transaction, we intend to distribute $3.50 per share or approximately $35.0 million (which would include the $1.00 per share dividend mentioned in the Company's March 2, 2021 press release), consisting of proceeds from the sale of the Transition Networks and Net2Edge businesses and other available cash after closing the sale of these businesses, but prior to the closing of the CSI-Pineapple

merger. We will provide more information about the payment of dividends in the future."

For more information about the previously announced CSI-Pineapple merger visit https://www.commsystems.com/investor-resources.

Anita Kumar, CSI's CEO commented, "We are confident that we have found a great home for the employees and customers of Transition Networks and Net2Edge at Lantronix. There is a growing need for actionable insight with more intelligence, computing, analytics and ubiquitous connectivity at the edge of networks. Transition Networks' portfolio of Intelligent Edge power and connectivity products that deliver key solutions in Smart Cities, Smart Buildings and Intelligent Transportation Systems will accelerate Lantronix' ability to deliver Intelligent hardware and software solutions for the Internet of Things (IoT). With Lantronix' commitment to continued investment in this space through its purchase of the Transition Networks and Net2Edge businesses and the broader scale that will now become available to Lantronix, we expect this business to grow. Becoming part of Lantronix will not only offer the ability to continue our long tradition of quality products and exceptional customer support, but at the same time offer our customers a broader product offering with Lantronix' IoT gateways and out of band management solutions."

Dr. Kumar continued, "Lantronix will continue to keep a presence in Minnesota where Transition Networks is currently headquartered. Our team will be working closely with Lantronix to support our customers during the transition process without disruption."

Any statement about the Purchase Agreement and the transactions described in this press release is a summary and subject to the terms of the Purchase Agreement, which will be filed as an exhibit to a filing with the Securities and Exchange Commission ("SEC"), and to other SEC filings. The Company currently expects to file a preliminary proxy statement for its 2021 Annual Meeting of Shareholders and approval of the Purchase Agreement in early May 2021 with the meeting to be held in late June 2021, and closing to occur shortly after the meeting. See "Important Information and Where to Find It," set forth below.

**Additional Legacy CSI Assets**

In addition to its Transition Networks and Net2Edge businesses, CSI assets remaining to be sold include the Services & Support operating segment (JDL Technologies and Ecessa Corporation), which had revenues of $8.8 million in 2020, the Company's headquarters building in Minnetonka, Minnesota, currently listed for $10.0 million, and real estate in Hector, Minnesota, currently listed for $1.2 million. In addition to any cash dividends paid prior to the CSI-Pineapple merger, as previously disclosed, CSI shareholders immediately prior to this merger (i) will

receive a Contingent Value Right that will entitle them to 90% of the net proceeds of any legacy CSI assets that are sold within 18 months after the CSI-Pineapple merger and (ii) will have a continuing interest as shareholders in the combined CSI-Pineapple post-merger entity.

**Update on CSI Private Financing**

Consistent with CSI's previously disclosed plans, on April 11, 2021, CSI entered into a non-binding Letter of Intent for debt and equity financing ("Financing"). The Financing is subject to the negotiation and execution of a definitive securities purchase agreement and continuing investor due diligence and would be subject to CSI shareholder approval. CSI expects the Financing would close concurrently with closing of consummation of the CSI-Pineapple merger. Assuming the successful conclusion of Financing, CSI-Pineapple would use the Financing proceeds to refinance the Pineapple existing debt and to provide ongoing working capital, funds for future capital expenditures, and capital for general corporate purposes.

**About Communications Systems, Inc.**

Communications Systems, Inc., which has operated as an IoT intelligent edge products and services company, has announced its planned merger with Pineapple Energy. After the Pineapple merger, the Company will be positioned to grow organically and to acquire and grow leading local and regional solar, storage, and energy services companies nationwide. The vision is to power the energy transition through grass-roots growth of solar electricity paired with battery storage on consumers' homes.

**About Lantronix**

Lantronix, Inc. is a global provider of Software as a Service (SaaS), connectivity services, engineering services, intelligent hardware solutions for the Internet of Things (IoT) and Remote Environment Management (REM). Lantronix enables its customers to provide reliable and secure IoT Intelligent Edge and OOBM solutions while accelerating time to market. Lantronix' products and services dramatically simplify the creation, development, deployment, and management of IoT projects while providing quality, reliability and security across hardware, software, and solutions.

With three decades of proven experience in creating robust IoT technologies and OOBM solutions, Lantronix is an innovator in enabling its customers to build new business models, leverage greater efficiencies and realize the possibilities of the Internet of Things. Lantronix' solutions are deployed inside millions of machines at data centers, offices, and remote sites serving a wide range of industries,

including energy, agriculture, medical, security, manufacturing, distribution, transportation, retail, financial, environmental and government.

26. On June 15, 2021, the Company caused to be filed with the SEC a Schedule 14A Definitive Proxy Statement (the "Proxy Statement") in connection with the Proposed Transaction.

### B. The Proxy Statement Contains Materially False and Misleading Statements and Omissions

27. The Proxy Statement, which recommends that the Company's shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information concerning: (i) the financial analyses performed by the Company's financial advisor, Northland, in connection with its fairness opinion; and (ii) the sales process leading up to the Proposed Transaction.

28. The omission of the material information (referenced below) renders the following sections of the Proxy Statement false and misleading, among others: (i) Background of the E&S Sale Transaction; (ii) Reasons for the E&S Sale Transaction and Recommendation of the CSI Board of Directors; and (iii) Opinion of CSI's Financial Advisor.

29. Unless and until the material misstatements and omissions (referenced below) are remedied before the anticipated shareholder vote on the Proposed Transaction, Communications Systems shareholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

#### 1. Material Omissions Concerning Northland's Analyses

30. In connection with the Proposed Transaction, the Proxy Statement omits material information concerning analyses performed by Northland.

31. With respect to Northland's "*Discounted Cash Flow Analysis*," the Proxy Statement fails to disclose the stand-alone unlevered, after-tax free cash flows that the E&S

9

segment business was forecasted to generate during the calendar years ending December 31, 2021 through December 31, 2025 and all underlying line items. Notably, the cash flows were "based on financial projections and estimates of [Communications Systems's] management." This information must be disclosed to allow shareholders to assess the value of the Proposed Transaction consideration and, in turn, make a more fully informed vote in connection with the Proposed Transaction.

32. Further, with respect to Northland's "*Discounted Cash Flow Analysis*," the Proxy Statement also fails to disclose: (1) the net operating loss carryforwards expected by Communications System's management and utilized by Northland in its analysis; (2) the terminal values for the E&S segment; and (3) the individual inputs and assumptions underlying the (i) range of discount rates of 14.7% to 17.7%; and (ii) perpetuity growth rates of 0.0% to 0.4%.

33. The Proxy Statement fails to disclose the individual multiples and financial metrics for the companies and transactions observed by Northland in its "*Selected Public Companies Analysis*" and "*Selected Precedent Transactions Analysis*."

34. The valuation methods, underlying assumptions, and key inputs used by Northland in rendering its purported fairness opinion must be fairly disclosed to the Company's shareholders. The description of Northland's fairness opinion and analyses, however, fails to include key inputs and assumptions underlying those analyses. Without the information described above, the Company's shareholders are unable to fully understand Northland's fairness opinion and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for or against the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

**2. Material Omissions Concerning the Sales Process Leading up to the Proposed Transaction**

35. The Proxy Statement omits material information concerning the sales process leading up to the Proposed Transaction.

36. First, while the Proxy Statement provides that the Company "entered into confidentiality agreements with certain potential buyers of the E&S Segment" it fails to disclose the terms of such confidentiality agreements, including whether such agreements contained standstill provisions with a "don't ask, don't waive" (DADW) provision (including its time of enforcement) that would preclude potential buyers from making a superior offer for some or all of the E&S segment. *See* Proxy Statement at 21.

37. Without this information, the Company's shareholders may have the mistaken belief that potential suitors are or were permitted to submit superior proposals for all or a portion of the E&S segment, when in fact they are or were contractually prohibited from doing so. This information is material because a reasonable Communications Systems shareholder would want to know, prior to voting for or against the Proposed Transaction, whether such parties are or were foreclosed from submitting a superior proposal.

38. Second, the Proxy Statement fails to disclose, with sufficient specificity, the terms and values of all offers, proposals, indications of interest, and letters of intent received by the Company with respect to the sale of some or all of its E&S segment.

39. Around February 2021, Northland "continued to solicit indications of interest regarding a transaction involving the E&S Segment" and the Company entered into confidentiality agreements with certain potential buyers for the E&S segment, shared certain financial and other business information with such parties, and discussed potential alternative proposals regarding the E&S segment business. *See* Proxy Statement at 21. The Proxy Statement then summarily provides

11

that "none of the potential proposals discussed with other parties matched the value to shareholders and certainty of closing contemplated by Lantronix's February 5, 2021 letter of intent."[1] *See Id*. Yet the Proxy Statement fails to disclose the specific terms and values of all such offers, proposals, and indications of interest.

40. Similarly, the Proxy Statement summarily provides that the Board held a special meeting on April 27, 2021 where it "reviewed the history of discussions with . . . Company A, Company B, and other potential purchasers contacted to gauge potential interest in the E&S Segment business, noting that none of these discussions resulted in receiving an indication of interest or offer to purchase the E&S Segment on terms that it considered to be competitive with Lantronix's offer."[2] *See* Proxy Statement at 24. Yet the Proxy Statement fails to disclose the specific terms and values of all such offers and indications of interest from Company A, Company B, and other potential purchasers.

41. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

## COUNT I
### For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder
### Against All Defendants

42. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

---

[1] Lantronix's February 5, 2021 letter of intent purports to reflect a base purchase price of $25 million and a $7 million potential earnout contingent upon meeting certain revenue targets. *See* Proxy Statement at 21.

[2] According to the Proxy Statement, on April 8 2021, the Company had an introductory call with the CEO of Company B, a private business the Company viewed as a competitor to its E&S segment. But for some reason the Company cancelled a planned follow-up call with Company B the next week without disclosing the reason for doing so in the Proxy Statement. *See* Proxy Statement at 23.

43. During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

44. Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and misleading Proxy Statement.

45. The false and misleading statements and omissions in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

46. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

47. Because of the false and misleading statements and omissions in the Proxy Statement, Plaintiff is threatened with irreparable harm.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

48. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

49. The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Proxy Statement.

50. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Proxy Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

51. In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Proxy Statement at issue contains the recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Proxy Statement.

52. In addition, as the Proxy Statement sets forth at length, and as described herein, the

Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

53. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

54. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

D. Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

    E.    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

| | |
|---|---|
| Dated: July 8, 2021 | Respectfully submitted, |
| | **HALPER SADEH LLP** |
| | By: /s/ Daniel Sadeh<br>Daniel Sadeh, Esq.<br>Zachary Halper, Esq. (to be admitted *pro hac vice*)<br>667 Madison Avenue, 5th Floor<br>New York, NY 10065<br>Telephone: (212) 763-0060<br>Facsimile: (646) 776-2600<br>Email: sadeh@halpersadeh.com<br>        zhalper@halpersadeh.com |
| | *Counsel for Plaintiff* |